IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DNA GENOTEK INC., )
 )
      Plaintiff, )
 )
v. ) Civ. No. 15-661-SLR
 )
SPECTRUM DNA, SPECTRUM )
SOLUTIONS L.L.C., and SPECTRUM )
PACKAGING L.L.C., )
 )
      Defendants. )

John W. Shaw, Esquire, and Karen E. Keller, Esquire of Shaw Keller LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: David C. Doyle, Esquire, Brian M. Kramer, Esquire, John R. Lanham, Esquire, and Dean S. Atyia, Esquire of Morrison Foerster LLP San Diego, California.

David E. Moore, Esquire, Bindu A. Palapura, Esquire, and Stephanie E. O'Byrne, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Jeffrey E. Ostro, Esquire, Jonathan C. Sanders, Esquire, and JaeWon Lee, Esquire of Simpson Thacher Bartlett LLP, Palo Alto, California.

**MEMORANDUM OPINION**

Dated: December 14, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff DNA Genotek Inc. ("Genotek") sued defendants Spectrum DNA, Spectrum Solutions L.L.C., and Spectrum Packaging L.L.C. (collectively, "Spectrum") for patent infringement. (D.I. 1) Spectrum moved to dismiss for lack of personal jurisdiction. (D.I. 19) Although the court did not find persuasive Genotek's argument that the record supported statutory jurisdiction under Delaware's "dual jurisdiction" theory, the court denied the motion and ordered jurisdictional discovery. *DNA Genotek Inc. v. Spectrum DNA*, 159 F. Supp. 3d 477, 483 (D. Del. 2016). The parties have completed discovery, and Spectrum renewed its motion to dismiss for lack of personal jurisdiction. (D.I. 87) The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). For the reasons discussed below, Spectrum's motion to dismiss is granted.

## II. BACKGROUND

Genotek is a leading provider of products for biological sample collection, and the owner by assignment of United States Patent No. 8,221,381 B2 (the "'381 patent"). (D.I. 70 ¶¶ 8, 10) Spectrum manufactures a saliva collection device ("the accused product") that, according to Genotek, infringes on the '381 patent. (*Id.* at ¶ 6) Spectrum's principal place of business is in Utah, and it manufactures the accused product in Utah and Malaysia. (*Id.*; D.I. 88 at 3) Spectrum does not have any offices, employees, or other physical presence in Delaware. (*Id.*) It does not own any property (real or personal) in Delaware, and it does not maintain any facilities or equipment in

Delaware. (*Id.*) Spectrum is not registered to do business in Delaware. (D.I. 88 at 8) Spectrum owns three websites, none of which contain any pricing information or allow for direct purchases of the accused product.

Spectrum manufactures the saliva collection device for Ancestry.com DNA LLC ("Ancestry") pursuant to an October 2012 manufacturing agreement, as amended in September 2014. (D.I. 88 at 4) Ancestry sells a DNA testing service. (*Id.*) When a customer signs up for the service, Ancestry sends the customer a kit with the saliva collection device. (*Id.*) The customer deposits a saliva sample in the device and returns it for testing. (*Id.*) Spectrum and Ancestry operate independently and keep separate finances. (*Id.* at 4-5) Spectrum does not share any officers or directors with Ancestry. (*Id.* at 4) Neither company has an ownership interest in the other. (*Id.* at 5)

Under the manufacturing agreement, Ancestry owns the intellectual property rights to the accused product. (D.I. 88 at 4; D.I. 99, Ex. 6 §§ 1.17, 2.6, 13.2) Spectrum or its affiliates must manufacture, package, and label the accused products in accordance with Ancestry's specifications. (D.I. 99, Ex. 6 §§ 1.13, 2.3) Ancestry is obligated to indemnify Spectrum for "[a]ny claim that the manufacture, use, sale, offer for sale, import, or other distribution of the Product infringes a patent...." (*Id.* at § 10.1(b)) Spectrum must indemnify Ancestry for any product liability claims. (*Id.* at § 10.2) Ancestry pays for and owns any custom tooling Spectrum uses to manufacture the accused product. (*Id.* at § 2.10) Spectrum must manufacture enough accused products to meet Ancestry's product forecasts. (*Id.* at § 2.2) In January 2016, Ancestry's Global Operations Manager sent an email with a draft forecast predicting the

sale of approximately 1,500,000 units of the accused product in the United States for year 2016.[1] (D.I. 99, Ex. 12)

Finally, the manufacturing agreement requires Spectrum to ship the accused products F.O.B. either to Ancestry's location in Utah or another location designated by Ancestry. (D.I. 99, Ex. 6 § 3) Genotek does not dispute Spectrum's assertion that it has not shipped any accused products to Delaware. (D.I. 88 at 3) Ancestry admits that it has sent "one or more" of the accused product to customers with addresses in Delaware. (D.I. 99, Ex. 22 at 3-4) In addition, two of Spectrum's counsel ordered Ancestry's genetic testing kit, which includes the accused product, from a storefront Ancestry maintains on the Amazon.com website.[2] (D.I. 100; D.I. 101) Thus, Genotek has presented evidence that at least three of the accused products have reached Delaware.

Ancestry and Spectrum are parties to a separate Purchase and Sales Commission Agreement, dated December 31, 2014, that permits Spectrum to buy some of the kits it manufactures for Ancestry and resell them to third parties. (D.I. 99, Ex. 10) Under that agreement, Spectrum pays Ancestry a fixed price per kit, plus a percentage

---

[1] Genotek also relies on an email from a Spectrum sales manager stating "over 2 million kits tested." (D.I. 98 at 10 (citing D.I. 99, Ex 8)) But it is not clear whether a tested kit equates to a sold kit. It is also unclear over what time span the 2 million kits were tested, making it hard to gauge the significance of this fact.

[2] There is some doubt whether the sales to Spectrum's counsel qualifies as competent evidence. The purchases occurred more than a year after the complaint was filed and after the court's resolution of the first motion to dismiss. (D.I. 100; D.I. 101) At a minimum, "the jurisdiction of the Court depends upon the state of things at the time of the action brought." *Forest Lab. Inc. v. Cobalt Lab. Inc.*, 2009 WL 605745, at *10 (D. Del. Mar. 9, 2009). Thus, evidence that the product has been introduced into the forum state "must have occurred prior to the filing of the complaint." *Id.* Because resolution of this motion does not depend on this particular evidence, the court need not resolve the issue.

3

of the net price to the end customer. (*Id.*) Spectrum has sold the accused product to five third-party customers, none in Delaware. (D.I. 88 at 5) At least ninety-nine percent of Spectrum's sales are to Ancestry. (D.I. 106 at 5; D.I. 98 at 4)

## III. STANDARD OF REVIEW

Rule 12(b)(2) of the Federal Rules of Civil Procedure directs the court to dismiss a case when the court lacks personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). Plaintiff bears the burden of establishing that sufficient minimum contacts have occurred between the defendant and the forum to support jurisdiction. *See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, the plaintiff cannot "rely on the bare pleadings alone," *Quantum Loyalty Sys., Inc. v. TPG Rewards, Inc.*, 2009 WL 5184350, at *2 (D. Del. Dec. 23, 2009), but must produce "sworn affidavits or other competent evidence," *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984). In reviewing the evidence, the court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004); *Traynor v. Liu*, 495 F. Supp. 2d 444, 448 (D. Del. 2007). A plaintiff "need only establish a prima facie case of personal jurisdiction" when the court has not held an evidentiary hearing. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007).

## IV. DISCUSSION

There are two requirements to exercising personal jurisdiction over a defendant, one statutory and the other constitutional. Plaintiff must show that: (1) "there is a statutory basis for jurisdiction under the forum state's long arm statute;" and (2) "the

4

exercise of jurisdiction comports with the defendant's right to due process." *L'Athene, Inc. v. EarthSpring LLC*, 570 F. Supp. 2d 588, 590 (D. Del. 2008); *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293 (3d Cir. 1985). Although Delaware's long-arm statute is "construed to the maximum extent possible under the due process clause," *LaNuova D & B S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986), these two tests are "independent," *Wright v. Am. Home Prod. Corp.*, 768 A.2d 518, 527 (Del. Super. 2000), and cannot be "collapsed into a single constitutional inquiry," *Tell v. Roman Catholic Bishops of Diocese of Allentown*, 2010 WL 1691199, at *8 (Del. Super. Apr. 26, 2010).

Delaware's long arm statute allows a court to exercise personal jurisdiction over a defendant when the defendant or its agent:

> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply services or things in this State;
>
> (3) Causes tortious injury in the State by an act or omission in this State; or
>
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State.

10 *Del. C.* § 3104(c)(1)–(4). Subsections (c)(1) through (c)(3) are specific jurisdiction provisions, where there must be a nexus between the cause of action and the conduct of the defendant. *Quantum Loyalty*, 2009 WL 5184350, at *3. Subsection (c)(4) is a general jurisdiction provision, which requires a greater extent of contacts, but applies when the claim is unrelated to forum contacts. *Id.*

Genotek does not argue that Spectrum fits under any one specific prong of the long arm statute. Instead, Genotek asserts that the court has personal jurisdiction over Spectrum based on either Delaware's "dual jurisdiction" theory or Spectrum's agency

5

relationship with Ancestry. (D.I. 98 at 8-12) Each of these theories are addressed in turn.

## A. Dual Jurisdiction Theory

Dual jurisdiction is a theory unique to Delaware that applies stream-of-commerce jurisprudence to Delaware's long arm statute. *Eastman Chem. Co. v. AlphaPet Inc.*, 2011 WL 6004079, at *15 (D. Del. Nov. 4, 2011). The central premise is that a non-resident may have sufficient contacts for the purposes of Delaware's long arm statute where, through the stream of commerce, its products have been introduced into the forum state. *Id.* The dual jurisdiction theory relies on partial satisfaction of subsections (c)(1) and (c)(4). *Belden Techs., Inc. v. LS Corp.*, 829 F. Supp. 2d 260, 267 (D. Del. 2010). Under this theory, plaintiff has the burden of demonstrating that: (1) defendant has an intent to serve the Delaware market; (2) this intent results in the introduction of the accused product into Delaware; and (3) plaintiff's cause of action arises from injuries caused by the sale of the accused products in Delaware. *Id.*

Genotek argues that "[n]othing more is required to meet the [intent] prong of the dual jurisdictional test" than showing that: (1) "millions of the accused products have been sold all over the United States;" (2) Spectrum "participated in the development and manufacturing of the accused products; and (3) Spectrum "sends the accused products to distributors who ship the product nationwide." (D.I. 98 at 10) These broad assertions do not accurately reflect the facts of the case or legal precedent and, upon closer scrutiny, are insufficient to find intent.

It is true, as Genotek points out, that several cases have found dual jurisdiction based on the principle that "a non-resident firm's intent to serve the United States

6

market is sufficient to establish an intent to serve the Delaware market, unless there is evidence that the firm intended to exclude from its marketing and distribution efforts some portion of the country that includes Delaware." *Power Integrations, Inc. v. BCD Semiconductor Corp.*, 547 F. Supp. 2d 365, 373 (D. Del. 2008). Nevertheless, a survey of those cases shows that stream of commerce jurisprudence cannot be reduced to bright line rules.[3] Accordingly, this principle should not be divorced from the factual context of the cases applying it.

In several of those cases, defendant sold a product directly to national resellers who added nothing significant to the product before selling it through well-established sales channels, often with physical locations in Delaware, to consumers or end-users. *See Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, 2016 WL 4413140, at *7 (D. Del. Aug. 17, 2016) (defendant sold its product directly to national retailers like Best Buy and Walmart); *Segway Inc. v. Inventist, Inc.*, 2016 WL 1650468, at *2 (D. Del. Apr. 25, 2016) (defendant sold its product directly to national retail chains, such as Kmart and Target, and national internet retailers, such as Amazon.com); *Boone v. Oy Partek Ab*, 724 A.2d 1150, 1158 (Del. Super. 1997) (defendant engaged an "exclusive distributor" to sell its products in the United States).

Occasionally, defendant's wholly-owned subsidiary, which presumably would have been under defendant's control, was responsible for selling defendant's products to a national reseller. *See Graphics Prop. Holdings, Inc. v. ASUS Comput. Int'l*, 70 F. Supp. 3d 654, 662 (D. Del. 2014) (foreign defendant targeted the United States market

---

[3] For example, the Supreme Court has never garnered more than a plurality for any one stream of commerce test. *See Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102 (1987); *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011).

by selling products to its wholly-owned California subsidiary, which then sold the accused products to United States resellers, such as Best Buy); *Sony Corp. v. Pace PLC*, 2016 WL 593455, at *4 (D. Del. Feb. 12, 2016) (defendant demonstrated an intent to serve the Delaware market by transferring title of accused products to a wholly owned Delaware subsidiary, which then sold the accused products to national distributors, including Comcast and DirecTV). The court, however, has found no intent where a subsidiary's "manufacturing operations [were] directed by its parent," the finished products were sold exclusively to the parent, and the parent sold the product throughout the United States, including Delaware. *Intellectual Ventures I LLC v. Nikon*, 935 F. Supp. 2d 787, 792-94 (D. Del. 2013).

Here, Spectrum has not sold a product (either directly or through a subsidiary) to a national reseller.[4] Instead, Spectrum manufacturers a saliva collection device per Ancestry's specifications, using intellectual property and tooling owned by Ancestry, in a

---

[4] Even if Spectrum had sold the product directly to a national reseller, this bare fact alone would not be sufficient to infer intent. Each case that found intent based on national distribution recognized additional facts that supported the finding. *See Godo Kaisha*, 2016 WL 4413140, at *7 (defendant also sold directly to U.S. customers through a storefront it maintained on Amazon.com); *Segway*, 2016 WL 1650468, at *4 (finding "[m]ost significantly" that defendant maintained "an interactive website through which the accused products can be purchased, including by consumers located in Delaware"); *Boone*, 724 A.2d at 1158 (noting that defendant shipped up to 50 tons per month of asbestos into Delaware over ten years, resulting in a "persistent course of conduct in this State" from which defendant "derived substantial revenue"); *Graphics Prop.*, 70 F. Supp. 3d at 662 (finding "[o]f key significance … the fact that there are at least three physical resale outlets (Best Buy stores) inside Delaware that stock and sell the accused devices"); *Sony*, 2016 WL 593455, at *1 (noting that defendant derived over $1.5 billion in revenue from U.S. sales, was a "major supplier" of equipment to DirecTV and Comcast, and Comcast maintained several physical service centers throughout Delaware). Spectrum does not maintain a website where its products may be purchased directly by consumers. (D.I. 88 at 4) Genotek has not shown that Spectrum regularly ships products into Delaware, derives substantial revenue from products sold in Delaware, or has its products stocked in Delaware stores.

8

quantity sufficient to meet Ancestry's estimated product forecast, and then sells the product exclusively to Ancestry. (D.I. 99, Ex. 6 §§ 2.1, 2.2, 2.6, 2.10 & Recital B) Spectrum has no control over what happens to the accused products once shipped to Ancestry. (D.I. 88 at 4) If Spectrum wants to sell the accused products to someone other than Ancestry, it must first purchase the accused products it manufactures for Ancestry from Ancestry. (D.I. 90, Ex. F) Accordingly, this case is more akin to the facts in *Nikon* than any of the cases cited by Genotek. (D.I. 98 at 8-12)

The facts supporting intent are even more attenuated if the court takes into account that there is no evidence the accused product has reached Delaware except as a part of Ancestry's testing service, making Spectrum's role analogous to that of a component manufacturer. "[T]he fact that [Spectrum] supplies only components and not the final assembly does not insulate [Spectrum] from jurisdiction." *Robert Bosch LLC v. Alberee Prod., Inc.*, 70 F. Supp. 3d 665, 680 (D. Del. 2014). But in cases finding dual jurisdiction over a component manufacturer, something more than the mere presence of millions of the accused products in the United States is needed to demonstrate intent. *See, e.g., id.* (finding insufficient evidence of intent, even though API sold "millions" of components to Alberee, who along with Saver, sold the finished products to Costco, because "[a]side from the components appearing in Delaware as finished products, there is no evidence that API has any ties to Delaware other than this suit").

Two opinions written in *Power Integrations, Inc. v. BCD Semiconductor Corp.* illustrate the several different kinds of facts that can help establish intent for a component manufacturer. 547 F. Supp. 2d 365 (D. Del. 2008) (the "April" opinion); 2008 WL 3850871 (D. Del. Aug. 21, 2008) (the "August" opinion). BCD, a Chinese

9

company, sold chips accused of patent infringement to Korean distributors, who in turn sold them to Korean manufacturers, who incorporated the chips into chargers made for Samsung phones, which were then sold throughout the United States. *April Opinion*, 547 F. Supp. 2d at 369. At least four companies independent of BCD were responsible for the final destination of the accused chips after they left BCD's control in China. *August Opinion*, 2008 WL 3850871, at *6. Nevertheless, the court found that BCD had an intent to serve the Delaware market because: (1) BCD custom designed accused chips to meet U.S. specifications; (2) BCD provided customers with indemnification from patent liability; (3) "tens of thousands of chargers containing the accused chips have been shipped into Delaware through established sales channels, including approximately 17,000 of the incorporating chargers that were sold in Delaware in the third quarter of 2007 alone;" and (4) there was no evidence BCD intended to exclude Delaware from its efforts to penetrate the U.S. market. *Id.* at *2-*4 (internal punctuation omitted).

Genotek has presented no evidence similar to the facts giving rise to dual jurisdiction in *Power Integrations*. Deposition testimony shows that Spectrum employees advised Ancestry on its manufacturing capabilities, such as the limits of ejection molding. (D.I. 98 at 10) But this is not the same as customizing a product specifically so it can be sold in Delaware. *See Power Integrations*, 2008 WL 3850871, at *1 (finding intent where component manufacturer with worldwide sales designed accused chips to meet U.S. specifications); *W.L. Gore & Assoc., Inc. v. Label Tech., Inc.*, 2009 WL 1372106, at *3 (D. Del. May 15, 2009) (finding intent where defendant

10

knowingly manufactured a component for automotive headlamps designed specifically for use in the Dodge Durango and Chrysler Aspen manufactured at plants in Delaware).

In an attempt to suggest that Spectrum sells its products to national resellers, Genotek makes the assertion that Spectrum "sends the accused products to distributors who ship the product nationwide." (D.I. 98 at 10) In fact, Spectrum did not sell the product to Amazon.com. In compliance with the manufacturing agreement, Spectrum shipped the accused products at Ancestry's direction to Amazon.com in Joliet, Illinois. (D.I. 88 at 13) This is not the same as a company shipping a product to a national reseller as part of its own marketing and distribution plan. For this and other reasons, the cases on which Genotek relies are distinguishable.[5] (D.I. 98 (citing *Bosch,* 70 F. Supp. 3d at 676; *Sony Corp.,* 2016 WL 593455, at *4)).

Finally, the court notes that the manufacturing agreement obligates Ancestry to indemnify Spectrum for patent infringement claims, not the other way around. (D.I. 99, Ex. 6 § 10.1) Dual jurisdiction is "a basis for specific personal jurisdiction under Delaware law." *Segway,* 2016 WL 1650468, at *3. Thus, there must be a nexus between the cause of action and defendant's conduct. *Quantum Loyalty,* 2009 WL 5184350, at *3. For example, in *Power Integrations,* BCD indemnified customers for claims based on patent infringement, and plaintiff's claim in that case was patent

---

[5] The two other cases Genotek cites are inapplicable to dual jurisdiction. *Renner* arises under the long-arm statute of Pennsylvania, not Delaware, and addresses only the constitutional prong of personal jurisdiction. *Renner v. Lanard Toys Ltd.,* 33 F.3d 277, 279 (3rd Cir. 1994). Pennsylvania has not adopted the dual jurisdiction theory. Moreover, Delaware law instructs courts to not collapse the constitutional prong of personal jurisdiction into the statutory prong. *Tell,* 2010 WL 1691199, at *8. *Philips* was decided under subsection (c)(1) of Delaware's long-arm statute, not dual jurisdiction. *Philips Elec. N. Am. Corp. v. Contec Corp.,* 2004 WL 503602, at *3 (D. Del. Mar. 11, 2004).

11

infringement. 547 F. Supp. 2d at 367. Thus, Spectrum's obligation to indemnify Ancestry for product liability claims would be insufficient evidence of intent to serve the Delaware market where Genotek's claim is based on patent infringement.

**B.  Agency Theory**

Genotek argues that Spectrum is also subject to jurisdiction in Delaware, because Ancestry is an agent of Spectrum. (D.I. 98 at 12-13) Under Delaware's long-arm statute, the court may exercise personal jurisdiction over a nonresident that makes contact with the state "through an agent." 10 *Del. C.* § 3104(c). Courts that have relied upon the agency theory of jurisdiction have required, at minimum, the existence of some corporate affiliation or control. *See, e.g., Cephalon, Inc. v. Watson Pharm., Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) (explaining that the agency theory applies to parents and subsidiaries or subsidies that are "two arms of the same business group"); *Waters v. Deutz Corp.*, 460 A.2d 1332, 1337–38 (Del. Super. 1983) (holding that 10 *Del. C.* § 3104 authorized jurisdiction over a foreign manufacturer "based on the commercial marketing activities of its subsidiary"); *Wesley–Jessen Corp. v. Pilkington Visioncare, Inc.*, 863 F. Supp. 186, 188 (D. Del. 1993) (finding jurisdiction based on an agency relationship where both companies were wholly owned affiliates of the same parent); *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1379 (Fed. Cir. 2015) (stating that to "establish jurisdiction under an agency theory," plaintiffs must "show that the defendant exercises control over the activities of the third-party"); *Del. Mktg Partners, LLC. v. Creditron Fin. Serv., Inc.*, 2004 WL 1999973, at *3 (D. Del. Aug. 31, 2004) ("In order for actions by an agent to meet the requirements of § 3104, the plaintiff must show that the defendants were directing or controlling the activities within Delaware.").

12

Genotek has not carried its burden of showing an agency relationship. Spectrum and Ancestry do not have a parent/subsidiary relationship and are not subsidiaries under control of a common parent. (D.I. 88 at 4-5) Instead, Spectrum and Ancestry are two wholly independent unaffiliated corporations. (*Id.*) In addition, Genotek has not provided any evidence that Spectrum controls Ancestry. Indeed, Genotek admits that control is working in the opposite direction; "Ancestry is controlling [Spectrum]." (D.I. 114 at 45) Genotek argues that Ancestry and Spectrum have an "open dialogue" and "collaborate" on the design, shipping, warehousing, and tracking of the accused products. (D.I. 98 at 2, 16) But cooperation between the two corporations is not the same as control. Genotek has not provided any authority showing that a court will find an agency relationship in the absence of a corporate affiliation or control by the principal over the purported agent. Accordingly, Ancestry's contacts with Delaware cannot be attributed to Spectrum under an agency theory.

Because Genotek has not shown that either the dual jurisdiction theory or agency theory apply to Spectrum, there is no statutory basis for personal jurisdiction over Spectrum. The court need not address the Constitutional analysis. *Brennerman v. Guardian News & Media Ltd.*, 2015 WL 9484466, at *4 (D. Del. Dec. 29, 2015) (stating that where there is no basis for jurisdiction under the long-arm statute, the court need not address the Due Process Clause).

## V. CONCLUSION

For the foregoing reasons, Spectrum's motion to dismiss is granted. (D.I. 87) An appropriate order shall issue.